al. You may proceed. May it please the Court, I am Jack Edwards on behalf of Appellants Roger Connell and Richard Ashcroft. I will be arguing the vesting and choice of law issues today, and my colleague David Siegel will be arguing the other issues. First, the District Court erred in finding that the deferred compensation was unvested and that that was a material fact. The issue is not whether the deferred compensation was vested, but rather whether it was a property right. We know from divorce and bankruptcy cases that unvested interests can be divided between spouses and creditors. And as a practical matter, if an unvested property right is large enough, its forfeiture will have a chilling effect on employee mobility. Justice Willett at oral argument in Drennan posed a question that I think nicely illustrates the point. He asked, so if I face a forfeiture of $5,000 in vested earnings, that would be a severe economic penalty. But if I face a forfeiture of $5 million in restricted stock awards, that's not a severe economic penalty, even though the financial disincentive to compete is about 100 times greater in the latter situation. The same is true for the forfeiture of any unvested property right. The test under the Haas case is whether the practical and economic reality of such a provision is that it inhibits competition virtually the same as a covenant not to compete. It's a practical test. It's irrelevant whether the property right is vested. If the forfeiture is large enough, the practical and economic effect will be to inhibit competition virtually the same as a covenant not to compete. So the deferred compensation is, in this case, is a property right worthy of protection. Second, the district court erred in enforcing the North Carolina choice of law provision because North Carolina law is contrary to fundamental Texas policy. In applying North Carolina law, the district court relied exclusively on one case from the Texas Supreme Court, ExxonMobil Corporation v. Drennan. But Drennan is inapplicable for several reasons. First, Drennan is inapplicable because Mr. Drennan had not yet earned his loyalty stock, while plaintiffs here had earned their deferred compensation. The stock in Drennan was a loyalty award. The executive there earned the stock by remaining loyal to Exxon in the future and specifically not engaging in detrimental activity. Mr. Drennan was not required to meet any performance goals to receive the stock. And if he had a bad year, he still received the loyalty stock. So when he left Exxon, he did not forfeit anything that he had earned. In contrast, plaintiffs here earned their deferred compensation based on their past performance in achieving pre-established performance goals. If they did not achieve those goals, they did not earn any deferred compensation. But the agreement also said they weren't paid it until a certain number of years had been reached. That's correct. It wasn't in there. You're trying to fit this in the case with the real estate commissions? Is that what you're saying applies? The renewal commissions the insurance agent had? That's correct. The Frankowitz case. And in the Frankowitz case, that's the only case that we found under Texas law involving a forfeiture of deferred compensation. And in that case, the insurance agent earned the renewal commissions based on selling the original insurance policy. And then he received renewal commissions every year that that client renewed their policy. And the agreement in that case. Even if you're right that under Texas law, this would fit within Frankowitz and be improper, how do you get from that to saying it's such a strong Texas policy there that you can't apply North Carolina law? I think. When the parties agreed to apply North Carolina. I think Frankowitz supports the proposition that an employee's right to receive compensation for work performed in the past is a fundamental Texas policy. You look at cases like the Dallgener case and Drennan, where the employees had contributed nothing to the pension fund in Dallgener and to the stock plan in Drennan. And the court found that those forfeitures were OK and didn't violate fundamental Texas public policy. I think that, you know. Another point is that in this case, the forfeiture clause required the employees to sign an invalid non-compete agreement. Mr. Drennan didn't have to sign any not any non-compete agreement, invalid or not. And there's a case, the Pokala case, where a doctor was required to resign from area hospitals and sign an invalid non-compete agreement. And the appeals court in that case said that that implemented that that was a non-compete agreement. And if it is a non-compete agreement, then the DeSantis case applies, and that is fundamental Texas public policy. And that's the only case we found involving a forfeiture clause that requires employees to sign an invalid non-compete agreement. Drennan didn't have to agree to the forfeiture clause? He agreed to the forfeiture clause. It was part of a loyalty stock plan. It wasn't part of his compensation like it is here with our clients. He agreed to it, though. I don't quite understand what you mean. He didn't agree to it. No, no. He didn't sign a non-compete agreement. He wasn't required to sign an invalid non-compete agreement as a condition to receiving his stock. Mr. Drennan could have gone to the beach and still gotten his loyalty stock. It still would have vested. But our clients, if they just retired and gone to the beach but not signed the invalid non-compete agreement, they would have forfeited their deferred compensation. Additionally, the forfeiture clause in Brennan was narrow. It was related to detrimental activity. So Mr. Drennan could go to another energy company, and as long as he didn't compete, the forfeiture clause wasn't triggered. Our clients basically had to retire. They couldn't go to any financial services business anywhere in the world and not just work there or compete, but they couldn't become associated with any financial services business for the rest of their lives. They could go there. They did go there. They're just going to get their pay for accruing a certain number of years. Right. Without the ---- They're working there now, right? Correct. Correct. Yes, they went and they competed, but the forfeiture clause per ---- it punishes activities other than competition and other than which Wells Fargo has an interest in prohibiting. The Exxon plan was narrowly tailored to Exxon's interest in prohibiting detrimental activity. I think it's important to distinguish between two types of awards in this case. They're performance awards and special awards. On page 111 of the record, the plan says performance awards are earned, quote, based on the participant's performance relative to the performance goals and objectives established for him or her in the plan year. That part of the definition was left out of the district court's opinion. We've also alleged that the deferred compensation was part of their compensation package in paragraphs 11 on pages 202 and 203 of the record. There was another type of award under this plan, a special award, and that was earned solely on the basis of his or her continuation in employee status for the designated service period. That could be like a loyalty award in Drennan, but we haven't had discovery, so we don't know the terms of any loyalty awards, if they included Wells Fargo stock or just if you stay here for a certain amount of time, you get the compensation. We don't know. We haven't had discovery. We know that there are two types of awards. It's possible, depending on the terms of a But we don't think Drennan applies to the performance awards because they're based on past performance. But they're based on past performance plus longevity. Right, but under Frankowitz, those loyalty conditions, you can't attach invalid loyalty conditions to deferred compensation. I think that's the lesson from Frankowitz, then, you know, then we're entitled to the deferred compensation. I see my time is up. All right. Thank you, counsel. May it please the Court. May it please the Court. David Siegel for Appellants. Your Honors, I'd like to briefly address two arguments in addition to those raised by my colleague, Mr. Edwards. First, there is an obvious need for discovery in this case. There is an underlying fact dispute about which plan or plans govern the plaintiff's claims. Even though at the 12B6 stage the plaintiff's allegations were entitled to be taken as true, the district court chose to accept Wells Fargo's allegation that a different version of the plan from the one complaint plaintiffs alleged that a 2011 version of this deferred compensation plan applied. Frankly, the reason for that allegation is it was one of the few plans that Mr. Ashcroft could actually remember being a participant in. He worked there from 1983 to 2013, and of course he doesn't know every single plan that he was a participant in. That plan was also available online, which explains how plaintiffs actually attached it to their complaint. It was part of litigation in California against Wells Fargo involving these same issues. So it was actually the only plan that we were able to get our hands on, and he remembered being a participant in that plan for some period of time, so we alleged it was applicable. But from the very beginning, from our opening petition through every argument we made in the motion to dismiss stage, we notified the Court that other plans were applicable and that we were entitled to discovery to understand what the terms of those plans were. The district court accepted Wells Fargo's assertion that a 2012 version of the plan applied without explaining why. Wells Fargo simply attached the plan to its motion to dismiss papers. They attached a business records affidavit attesting that it was a true and correct copy of a business record, but not attesting that it actually applied to Mr. Ashcroft or Mr. Connell or explaining which years they believed it applied to them. There was no further documentary proof of that point and no testimonial proof. They simply attached a business records affidavit, and the district court chose to apply that plan. The district court erred in doing that and in not permitting plaintiffs to conduct discovery to determine the full set of applicable plans. There are now at least four plans in the record. The original plan that the plaintiffs proffered, the 2012 plan that Wells Fargo proffered, another plan from A.G. Edwards dating to 2002, which plaintiffs found during the course of the motion to dismiss briefing. Is there any allegation that they were entitled to money under the 2002 plan? I mean, I saw where you put that in your briefing. Is that? The only reason I don't know for sure, Your Honor, is that I don't know what the vesting period is under the 2002 plan. It's conceivable if there was a very long vesting period, Mr. Ashcroft, for example, left in 2013. It's conceivable. I would concede maybe not likely, but we just don't know that he actually got an award under that plan. But it illustrates the larger point. He doesn't know? I mean, most people, they have big money coming to them. They know when it's supposed to be coming. They don't have the plans in their possession, and they don't, they're not, they're not allowed to keep these documents. There were no initial disclosures before the 12B6 grant? Right? I mean, even before you can request disclosures, there's initial disclosures in Federal court. Nothing, nothing. And these would be subject to initial disclosures, I would think, just the employees' plans that they. Well, the bottom line is they weren't given to us. I'd have to go back and check to see whether that was requested. I mean, the initial disclosures. As long as you don't have to request an initial disclosure. You don't have to request, you just have to provide them, and they certainly were not provided. So we've got. The only complaint about the plan Wells Fargo submitted is the forfeiture provision. Well, the reason. The only complaint about that plan. I mean, you're saying now there are other plans and that may not be the plan. Your Honor, the forfeiture provisions may operate differently, and that is a complaint that could be a complaint, but the real issue at this stage is we need to know whether or not the plan contains a choice of law provision. It's axiomatic in plaintiff's view that if a deferred compensation award was forfeited under a plan that did not contain a choice of law provision, that that claim would be governed under Texas law. The only reason the district court was able to dismiss this case to North Carolina law was because the plan that Wells Fargo said applied contained the North Carolina choice of law provision. Let me touch briefly on the cause of action that plaintiffs have alleged for penalty. The amended complaint states the cause of action for penalty. It alleges that the forfeiture provision operates as a penalty. The district court's dismissal order focused solely on whether or not forfeitures were enforceable under North Carolina law, but completely ignored the penalty analysis. Plaintiffs rely on the East Carolina Internal Medicine v. Fetus case. In that case, Dr. Fetus left her practice. The practice sued her under a, what was called a shared cost provision in her employment contract. She made two arguments, that it constituted a non-compete that was invalid and that it also constituted a penalty. The court rejected the non-compete argument, found that it was a forfeiture agreement, reaffirmed the principle that forfeitures are generally enforceable under North Carolina law. But then the court also conducted a penalty analysis and found that the clause there was enforceable because the amount forfeited bore some reasonable relation to the harm that the practice would actually suffer. They were able to demonstrate that they would lose money in having to rehire her, rehire her replacement, lose money associated with overhead that they had invested in her, and the damages that were forfeited under that clause bore a reasonable relation to the damages that the practice actually suffered. There's been no showing that that's the case here, and discovery would be necessary to prove whether or not that nexus exists. I see that my time is up. Thank you, Your Honors. Thank you. May it please the Court. Sean Jordan for Appellees. I'd like to start with counsel's last point with regard to North Carolina law because I think it can be addressed rather quickly. The point is that under North Carolina law, it's quite clear that these type of forfeiture provisions are not a problem. They are not considered a covenant not to compete or in restraint of trade. In fact, as Judge Rosenthal properly noted, they're not considered a restraint of trade at all, the reason being that these provisions operate to afford the employee a choice. They can either accept the additional compensation if they're loyal and they remain for the designated service period, or they can go and compete. Now, what counsel is raising is saying, well, but there's still a problem if it could be construed as an invalid penalty. But North Carolina quite clearly shows, as case after case that we cited say, that that only applies when there's a breach of a promise or a breach of an agreement. And let me just cite to the two cases they cite, the FIDUS case and the LATCO case. So the FIDUS case that he just talked about, it says, this is the North Carolina court in FIDUS. Quote, the crucial fact here is that defendant was only required to pay the liquidated damage upon breaching her promise not to compete with plaintiff in the described three-county area. The FIDUS court also says it is undisputed that defendant breached the contract. The LATCO case, which they cite in their reply brief and say and say again in North Carolina these invalid penalty analysis applies in other circumstances rather than just breach a contract, on the first page, this is an Eighth Circuit opinion. LATCO breached the loan commitment agreement by failing to meet its obligations thereunder prior to the expiration of the commitment period. The first page of the court says it's a breach case. And then on the second page of the opinion, the Eighth Circuit notes that a liquidated damage provision is used to discourage a party from breaching a contract and to avoid later a controversy concerning the amount of actual damages. And that opinion is based on North Carolina law, the Nutten case that we cite, and others. The point here is in this case there's no breach of agreement. There's no breach of promise. As you noted, Judge Costa, when these plaintiffs went out to compete, they were free to go and compete. All that was going to happen was they were going to forfeit their unvested compensation. That's perfectly appropriate, and North Carolina law has no problem with it, but certainly wasn't a breach of your promise, and it wouldn't invoke anything regarding penalty under North Carolina law. Let me come back to Texas law and go back to what the first counsel on the other side was talking about in terms of Texas law. As you noted, Judge Costa, the critical question here is not whether these provisions would be upheld under Texas law. The critical question under the Restatement Second of Conflict of Laws is, as under DeSantis and Drennan we know, is whether or not enforcing the party's choice of North Carolina law would contradict some fundamental policy of Texas, some fundamental public policy. The Drennan case clearly indicates it does not. In fact, as this Court has noted in, for example, the Cardoni opinion, that Texas follows strongly the party autonomy rule, that the Restatement says that the party autonomy rule will typically be enforced. The default, as this Court said, is that it will be enforced because it ensures that the party's contractual expectations are met. The Restatement says only in rare cases will there be a fundamental public policy against the – against a choice of law provision such that it couldn't be enforced based on public policy. The Drennan case clearly indicates that this does not. As you noted, Judge Costa, and you noted, Judge Graves, in Drennan we had virtually an identical situation. You had an employee who was a long-serving employee who was being given incentive awards, just like these employees. This is not their salary. These are incentive-based bonuses. I'm going to go to your point, Judge Costa, because you hit it exactly. There are two aspects to these. And in fact, the plan document that they relied upon and they submitted makes abundantly clear there are two aspects. The performance award that they mentioned here is the description in the document they submitted. It's at page 39 of the record. Performance award description, an incentive bonus credited to our participant's plan account in an amount based on their performance relative to the performance goals and objectives established for him or her for the plan year, and which vest and become payable only upon the participant's continuation in employee status for a designated term. In other portions of the same document, it says there are two aspects of this, of the performance award. You hit performance goals, number one, and number two, you stay loyal for designated periods of time. And the document says over and over again, you do not vest, this is not vested until you stay for the designated period. Therefore, the same as in Drennan, exactly the same in Drennan. In Drennan, remember, he was getting a bonus award that happened to be restricted stock. The stock became unrestricted on a timetable, on a timetable of three years, half the stock, then seven years, the remaining stock. During that time period, similar to this, Drennan could not engage in, quote, unquote, detrimental activity. And this was in every one of these agreements that he was a party to. It said you can't engage in detrimental activity, which lo and behold included competing or going to a competing company with Exxon. He went to Hess. As I think all three of you have noted, these two companies actually went and started working with competing companies. So they made a choice. They made a business decision that they felt like they could, that the money they would earn at this competing company was worth more than whatever was their unvested compensation. Drennan plainly indicates that that's not a covenant not to compete. That doesn't run afoul of any fundamental Texas public policy, simply because the employee's ability to go and get another job is not restricted. They had an absolute choice to do that. And Wells Fargo couldn't take, you know, had no reason to take legal action against them because they would just forfeit their unvested compensation. Now, I want to get to there are – this goes back to the Frankowitz case. So I want to say they've offered three reasons to try to distinguish Drennan, and I want to try to address those quickly. The first is they rely principally on these pre-Drennan cases that are basically inapposite. And, Judge Costa, you pointed out the one they seem to rely most heavily on in their reply brief, which is the Frankowitz case. As you noted, the key difference in Frankowitz is those renewal commissions, the Texas Supreme Court made clear those renewal commissions had vested. They had all vested. And so when – and so what was happening in Frankowitz is money was being clawed back. Money that had been earned, money that had been vested was being clawed back in terms of those renewal commissions. This is the opposite. These are monies that there is no – there is no disagreement that these individuals did not meet the designated service periods. Under the plain language of the document plan that they submitted, that they've relied on, it says these monies don't vest until you stay for the designated service period. So Frankowitz is simply inapposite. The other thing that the other – two other elements they've tried to say is they say that they now in their reply brief emphasize the DeSantis case. And they say that this Court should not uphold Judge Rosenthal's decision because it would be contrary to Texas's fundamental policy of uniform treatment of Texas employees. But importantly, that contention ignores that that was specifically addressed in Drennan. And in Drennan, the Texas Supreme Court said that Texas's policy had shifted in the 24 years since DeSantis. In fact, in Drennan, the Texas Supreme Court went on to say, with Texas now hosting many of the world's largest corporations, our public policy has shifted from a patriarchal one in which we valued uniform treatment of Texas employees from one employer to the next, above all else, to one in which we also value the ability of a company to maintain uniformity in its employment contracts across all employees wherever they may be. And in fact, if you look at the end of the Drennan opinion, the Texas Supreme Court puts an exclamation point on that on the importance of uniformity and says uniformity is – I want to make sure that I have this exactly right – uniformity is a worthy goal and a logical rationale for making a choice of law. That's the point from Drennan. It's a shift from DeSantis. So their argument that this Court should now go back and basically undo what Drennan clearly said about where Texas public policy is, the Court should reject that invitation. The third thing that the plaintiffs try to do is they make these factual distinctions between Drennan and this situation and say, see, there's factual distinctions, so Drennan doesn't apply. The problem for plaintiffs is all the factual distinctions they mention had nothing to do with the decision. The decision in Drennan didn't turn on them. So let me give you a few examples that they raise in their reply brief. They say, for example, that Drennan was a high-level executive and these individuals were not. But – and they mention what somebody said at oral argument. They have pages of oral argument. Well, the problem is that that's great, but the Drennan decision doesn't turn on that. There's nothing in the rationale – you won't find anything in the Texas Supreme Court's rationale or holdings that says this would only apply to high-level executives. The same applies to the distinction they make about personal services. They say, well, this – you know, these individuals were providing personal services to individuals, and Drennan wasn't. Again, we don't disagree with that, but it has nothing to do with the rationale for the Drennan decision. The Drennan decision did not turn on that. The Drennan decision turned on one seminal fact that is undisputed. These individuals didn't meet the designated loyalty periods, so therefore, it wasn't vested, which meant – which meant they didn't have a right to it. That's what it turned on. It didn't matter that it was personal services. It didn't matter that it was a high-ranking executive. Let me address briefly the Pocalla case, which you mentioned. There's two important, I think – two important misconceptions that they have about Pocalla. The first is a procedural one, which is – which, in their reply brief, you know, with all due respect to my friends on the other side, they're just – they're just mistaken. They tell the Court that the Texas Supreme Court's denial of review equaled upholding the Corpus Christi court of appeals decision in that case. That's simply not true under – under Texas procedural law. In fact, as the Texas Supreme Court has said most – I'm just going to give you one site, Loren Maintenance v. Ziani. It's at 210 Southwest 3rd, 593. The Supreme Court said, and I quote, declining to review a case is not evidence that the Court agrees with the law as decided by the court of appeals. It also said, quote, the denial or dismissal of a petition does not give any indication of this Court's decision on the merits of the issue. In addition, this applies to Pocalla, which they just denied review, the Texas Rules of Appellate Procedure provide an ample vehicle. If the Texas Supreme Court wanted to endorse the Corpus Christi court of appeals opinion, they have a way to do it. Under Texas Rule of Appellate Procedure 56.1c, they would have said refused, not denied, refused, because that rule says if the Supreme Court determines after a response has been filed or requested that the court of appeals judgment is correct and that the legal principles announcing opinion are likewise correct, the court will refuse the petition. It didn't refuse it. It denied it. Rule 56.1b applies to denials, which says if the Texas Supreme Court is not satisfied that the opinion of the court of appeals has correctly declared the law in all respects but determines that it presents no error that requires reversal or that is of such importance to the jurisprudence of the State, then it will do denied. So the fact that it did not do denied. Kennedy. How often are refused issued? Is that common? They are not, Judge Costa, they are not issued frequently. And that's why I think it is fair for the Court to simply say what the Texas Supreme Court has said over and over again, which is at a bare minimum, it is no evidence the Texas Supreme Court agrees whatsoever with the court of appeals opinion. And I would say this about Pocalla as well. Remember, Pocalla was absolutely dealing with a vested interest. This was a doctor who had shares of stock that were his. He owned them. It was a buy-sell agreement about how much he was going to be paid for them. And the fact that he was competing was going to result in him getting paid less. Instead of $233 a share, it's $100 a share. Again, this is not an argument. What about the arguments they made at the end of their presentation? First, about whether Judge Rosenthal should have relied at the 12B6 stage on just the 2012 agreement. And then two, more generally, this question of whether they have a right to discovery of other documents to see if they have a choice of law provision. Right. Right. Judge Costa, the beginning of that is that, first of all, Judge Rosenthal didn't just rely on Wells Fargo's submission. And you will see, and I think it's footnote 2 of her opinion, what she says is the plaintiff submitted a document and we submitted a document, and the Court said, look, there's not a material difference between these documents. And remember, Judge, you know, the plaintiff is the master of their complaint. And in this case, the plaintiffs relied throughout these proceedings on that document that they submitted over and over again. In fact, even in their briefing in this Court, they repeatedly referred to the plan they submitted as this agreement, the agreement at issue. This is the agreement. These are the provisions. They said it over and over and over again, even in their amended complaint. Now, and remember, this was not a 12B6 that played out over one or two months. This case was pending a year before Judge Rosenthal's decision was issued. Their first petition came at the end of September in 2015. We filed a motion to dismiss in December. They then filed an amended complaint in February. And still in the February amended complaint, they're not saying, you know, Judge, we can't do this. You've got to do discovery. There's no way we can respond. We can't even do this. They rely on the plan that they submitted. And they go through, you know, and they say, this is the plan. This is why you should rule in our favor. So the plaintiff as a master of complaint should be held to the decision they made to rely on it. And I would note that even in front of this Court, if you look at their opening brief, they say over and over again in the first 30 to 40 pages, the agreement This is the agreement. And so there's no dispute about that. The second point, Judge Costa, is that Judge Rosenthal was right. The plan we submitted and the plan they submitted, there isn't any material difference between these provisions. The forfeiture provisions operate the same way. The issue here is the same. The choice of law provisions operate the same way. They've noted a reference to ERISA in one of them, but as this Court has worded, no one, they have never said they think ERISA applies in any way to this case. And in any event, that would be waived. As this Court is well aware, any ERISA contention is waivable. It's never been raised even before this Court. Instead, before this Court and below, they've said North Carolina choice of law provision. At page, I'm sorry, this is their brief, page 9 of their opening brief, they say it's a North Carolina choice of law clause. In their first amended complaint, at page 180 of the record, they say it's a North Carolina choice of law clause, and they rely on that agreement throughout. The Court should hold them to the agreement, to what they have litigated this on, and they litigated it all the way through for months and months and months in Judge Rosenthal's court. And we don't think it's appropriate for them after the fact to now say, but Judge Rosenthal should have done something different, when what they relied on and what Wells Fargo relied on, there were no material differences between those plans. So we think that is the clear answer on that point. A point I'd like to distinguish is they noted that there are two types of awards. There is the performance award, and there is what they call the special award. And both of them, again, you can look at the plan that they submitted, both of them are plainly subject to the vesting requirement. The difference, the only difference is the performance award also has a performance requirement. So the performance requirement is they would establish, you know, for each plan year some objective performance you had to meet, but you would still have to have a longevity. You know, throughout, I would, you know, urge the Court to look at the plan they submitted, all repeatedly. And, in fact, something worth noting, again, this is what they, in their plan, there is a warning. There is a warning. This is at page 48. It says risks of plan participation. It says risk of forfeiting unvested balances. Each plan subaccount established for you will be subject to a vesting schedule, and you will forfeit each such subaccount, including the investment earnings, credit that subaccount if you voluntarily leave the company or you're terminated for a cause. And they, in their own pleadings, they say they were told repeatedly about the forfeiture provision. So there's no issue here that they weren't aware of what the plans contained. For all of these reasons, we think the Court should uphold and affirm Judge Rosenthal's decision, which clearly followed Drennan and what the plaintiffs are asking you to do, candidly, is reach a decision that would be contrary to Drennan. If there's no other questions, I'll give back the remainder of my time. All right. Thank you, counsel. Thank you. Rebuttal. All of the cases cited by Wells Fargo's attorney were decided at the motion for dispute at issue. Here in the record, we have four different plans, an A.G. Edwards plan from 2002. It's possible that it applies, but we're not sure. Wells Fargo has not told us. We believe our clients were employed by A.G. Edwards at that time, and it's possible, if not likely, that they earned awards under that plan. There's no choice of law provision in that plan. And I think the logical conclusion is it's possible, if not likely, that there are other A.G. Edwards plans that apply to our clients. And our reply brief at the end, we have You never presented that to the district court, did you, the 2002 plan? I mean, you found that's in your, I think, in your reply. No, we did. The 2002 plan was attached to our response to their motion to dismiss our amended complaint. I think, Judge Costa, you're referring to the 2012 plan, which we found before we were, right, while we were writing our reply brief, and that is identical to Wells Fargo's 2002 plan, except the participants are different. They're still financial advisors at Wells Fargo, but they're different types of participants, and there's an ERISA choice of law provision. Wells Fargo has asked Judge Rosenthal and is asking this court to take their word that this one plan document applies to our clients when our clients still insist that the 2011 plan applies to them, and it's possible the other 2012 plan applies to them. And I think it's a credibility determination. I think she made a fact determination. Wells Fargo, before the district court, attached a declaration, like a business records affidavit, saying this is a true and correct copy of the 2012 plan. Then, in a footnote in their motion to dismiss, they mention our plan and then say, but the operative plan is this other 2012 plan that they attached. There's no explanation. So when he says she looked at two different plans and made a determination that there was no material difference between the two, that's just not correct? That's not what happened? They're different plans, and one has an ERISA choice of law provision. We don't know if they would allege that. We don't know if that's proper to be an ERISA plan. It has to, the plan would have to qualify as an ERISA pension plan. You can't just say ERISA applies to this if it doesn't qualify to meet the statutory standard. So the answer is she did look at two different plans and decide that there was  none of the plans we've seen have a clause that say this plan applies retroactively to all plans and all awards earned under previous plans. So if our clients earned a performance award in 2008, we believe that would be governed by a 2008 plan, unless there's a provision in a later plan that says this applies retroactively to all previous awards. We haven't seen any clause like that and no explanation as to why a 2012 plan would govern previous awards earned in 2011, 2010, 2009, 2008. I think I'm still confused about this. You're saying of the plans that were presented by the parties at the Rule 12 stage, at least one of them did not contain a North Carolina choice of law provision? One of them, it contained, it said ERISA applies and to the extent not preempted North Carolina law applies. And then the other plan says just North Carolina law applies. And I want to get to a few more points. So we need discovery to determine which plans apply. Also, the uniformity concern in Drennan was the uniform treatment of employees at one company. And I think it made sense for Exxon to have that kind of uniformity because they had a mobile workforce. Mr. Drennan worked in Norway and Texas and New York and other employees worked around the world. And it made sense. Managing a plan like that would be very difficult with employees moving around the world. And you're, say, working in Nigeria. Well, what law applies if I engage in detrimental activity in that plan? Is it Nigerian law? Is it, you know, North Carolina law? Is it Texas law? I think that made sense for a mobile workforce. There's no evidence in the record that we have a mobile workforce here. These financial advisors lived in Abilene. They lived in Wells Fargo to do business in. They do business everywhere, but they... Why wouldn't they want all their employees to be treated alike? Well, but they're not treated alike because employees in California and North Dakota are not subject to the forfeiture clause. And so there's no uniform treatment to begin with in the plan, and they want to bring the uniformity concerns of Drennan into this case. But I really think the DeSantis uniformity concerns apply because you have some employees that signed the invalid noncompete agreement. They're going to be governed by Texas law under DeSantis. And the ones that don't sign the invalid noncompete agreement will be governed by North Carolina law under district court's opinion. So you have that dichotomy. I think it's best if all employees in Texas were governed by Texas law. All right. Thank you, Counsel. Thank you. The court will take this matter under advisement. That concludes our order.